# EXHIBIT I

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 2                MIDLAND-ODESSA DIVISION

 3  FINALROD IP, LLC, ET AL  ) Docket No. MO 15-CA-097 ADA
                             )
 4  vs.                      ) Midland, Texas
                             )
 5  JOHN CRANE, INC., ET AL  ) February 21, 2020

 6
                   TRANSCRIPT OF MOTION HEARING
 7          BEFORE THE HONORABLE ALAN D. ALBRIGHT

 8  APPEARANCES:

 9  For the Plaintiff:       Mr. John D. Holman
                             Mr. Terry B. Joseph
10                           Mr. David M. Lodholz
                             Matthews, Lawson, McCutcheon
11                           & Joseph, PLLC
                             2000 Bering Drive, Suite 700
12                           Houston, Texas 77057

13  For the Defendant:       Ms. Jennifer Parker Ainsworth
                             Wilson, Robertson & Cornelius, PC
14                           909 ESE Loop 323, Suite 400
                             Tyler, Texas 75701
15
                             Mr. Manny J. Caixeiro
16                           Dentons US, LLP
                             601 South Figueroa Street,
17                           Suite 2500
                             Los Angeles, California 90017
18
                             Mr. Timothy J. Carroll
19                           Dentons US, LLP
                             233 South Wacker Drive,
20                           Suite 5900
                             Chicago, Illinois 60606
21
    Court Reporter:          Ms. Lily Iva Reznik, CRR, RMR
22                           501 West 5th Street, Suite 4153
                             Austin, Texas 78701
23                           (512)391-8792

24

25  Proceedings reported by digital stenography, transcript
    produced by computer.
```

09:13:26

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

09:22:34  1   for -- and let me explain to you the way I see a Daubert

09:22:37  2   is.

09:22:40  3        If he were to have used a method -- this was, I

09:22:44  4   guess, for the plaintiffs now.  If he had used a method

09:22:47  5   that you are arguing was incorrect, I think that's fodder

09:22:51  6   for a method of establishing whether or not they were

09:22:56  7   similar.  That's something I think you can do on

09:22:58  8   cross-examination.

09:23:00  9        Whether or not he should have done that or not,

09:23:04  10  in other words, whether or not he should have gone to a

09:23:07  11  technical expert and have the technical expert provide

09:23:09  12  that opinion, that's the gating factor that I think I'm

09:23:12  13  supposed to play; and if he fails to do that, then I think

09:23:16  14  that's when I decide that the opinion is not reliable.

09:23:20  15       Do you agree with that?

09:23:21  16       MR. CAIXEIRO:  I think that's right.  And I think

09:23:23  17  here, we're in that latter category because what we have

09:23:26  18  here is just a -- an utter failure to use the right

09:23:34  19  hypothetical negotiation date.  And then, if you're going

09:23:36  20  to try to tie it back to that 2015 date, you have to

09:23:40  21  methodologically, you have to at least show through

09:23:44  22  technical and then, I think, from a damages perspective,

09:23:47  23  economic expert testimony that there's no material

09:23:50  24  difference between the two products, and that's just not

09:23:53  25  in the record.

09:26:31  1  the end fitting; rather, he says that the end fitting

09:26:34  2  contributes to 100 percent of the value.

09:26:37  3       Now, notably, Mr. Reading doesn't have a

09:26:43  4  technical basis to draw that kind of conclusion.

09:26:45  5       THE COURT:  Let me ask you this.  Did -- I get

09:26:48  6  what he said and I have some pretty serious issues with

09:26:52  7  that.  But I didn't see where -- and, of course,

09:26:56  8  everything I'm asking you, I'm hoping to foreshadow for

09:27:00  9  the plaintiff to fill me in.

09:27:01  10      But I didn't see where he had -- where the

09:27:06  11 plaintiffs had had the technical expert do the hard work

09:27:09  12 which I think is required, which is the technical expert

09:27:12  13 says all of this stuff is -- in other words, it's not up

09:27:19  14 to the defendant -- it's not up to the damage person to

09:27:22  15 say that we don't need to apportion because this is all --

09:27:27  16 all adds to the value.  That's, in my opinion, up to the

09:27:30  17 technical person to explain the value of the patented

09:27:35  18 feature with respect to the other features with respect to

09:27:38  19 the overall product.

09:27:40  20      And then, the damages expert takes from what the

09:27:43  21 technical expert said and says, based on that, I'm able to

09:27:48  22 do this with respect to apportionment.  And I didn't see

09:27:51  23 anywhere where the plaintiff had their technical expert

09:27:55  24 provide that information either.

09:27:57  25      Did I miss that?

09:27:58  1          MR. CAIXEIRO:  No, your Honor.

09:27:59  2          And I largely agree with that.  The one thing I

09:28:01  3  would say is, there could be circumstances where there's

09:28:04  4  some sort of economic -- there's some sort of marketing

09:28:07  5  feature, or sales feature, or something maybe that

09:28:09  6  wouldn't fall into the technical aspect.  So we're talking

09:28:13  7  hypothetically here, I could imagine a hypothetical

09:28:15  8  situation where an economic expert might also say, well, I

09:28:18  9  have more to say about that besides what the technical

09:28:20  10  expert says, but certainly you need the technical expert

09:28:24  11  at the baseline, and that's nonexistent in this record.

09:28:27  12          And what I think this case falls into -- we

09:28:31  13  highlighted this in our brief, but I think this is

09:28:33  14  squarely on point with the Federal Circuit's decision in

09:28:37  15  Finjan from 2018, which really holds that when you have a

09:28:40  16  whole product and a subcomponent, here, the sucker rod --

09:28:46  17  the entire sucker rod and an end fitting, and the patent

09:28:49  18  is -- contains technology reading on a portion of that

09:28:54  19  subcomponent, you then have to apportion between the

09:28:56  20  patented technology and the rest of the technology and the

09:28:59  21  subcomponent.

09:29:00  22          And the final point I'll make here is, there's no

09:29:02  23  dispute there's a lot of other technology in the

09:29:04  24  end-fitting subcomponent.  This patent at issue doesn't

09:29:07  25  cover end fittings, doesn't cover wedge end fittings,

09:29:10  1  doesn't cover metal end fittings, doesn't cover epoxy,

09:29:14  2  doesn't cover the raw materials.  It's just a particular

09:29:17  3  -- formation of the end fitting where the compressive

09:29:20  4  forces are greatest as the closed end.  That's a limited

09:29:25  5  amount of the technology within the end fitting.  And by

09:29:28  6  failing to take that into account at all, Mr. Reading has

09:29:31  7  failed to carry out his apportionment obligation.

09:29:33  8          THE COURT:  I had a damages expert argue that if

09:29:37  9  you -- their patent covered the -- basically the hub that

09:29:42  10  you used for the internet, and he argued with a straight

09:29:45  11  face that if that were on an airplane, you could use the

09:29:49  12  airplane as the basis of the value for the royalties, that

09:29:57  13  that didn't go over very well.

09:29:58  14          MR. CAIXEIRO:  It doesn't.  And I think the

09:30:00  15  Federal Circuit in recent years with the Finjan decision,

09:30:02  16  you look at the Power Integrations decision, I think that

09:30:05  17  the clear thrust of where the Federal Circuit is going on

09:30:08  18  this is that you can't make that kind of argument.  You

09:30:10  19  have to finish this apportionment.

09:30:13  20          Actually, final point, because this is the one

09:30:16  21  thing that plaintiffs tried to argue to get around this.

09:30:18  22  They tried to portray this as an entire market value rule

09:30:22  23  case.  Suffice it to say, this is not an entire market

09:30:25  24  value rule case.

09:30:25  25          THE COURT:  I'm pretty familiar with that, too.

09:30:28 1     MR. CAIXEIRO: Yeah. And last thing. One reason

09:30:30 2 it's not is, this expert never even mentioned entire

09:30:33 3 market value rule, so let's --

09:30:34 4     THE COURT: Oh, really.

09:30:35 5     MR. CAIXEIRO: We could stop there. That's

09:30:36 6 attorney argument --

09:30:36 7     THE COURT: I didn't realize -- I did see the

09:30:38 8 argument that they made about that and I didn't find

09:30:40 9 overly persuasive, but I didn't realize that there's

09:30:43 10 nothing in the damage expert report about.

09:30:46 11     MR. CAIXEIRO: No. Not at all.

09:30:47 12     THE COURT: Okay. Well, then, let me pivot off

09:30:49 13 that before I hear from the plaintiffs just to give you a

09:30:51 14 heads up on how I see things when we go to trial, which is

09:30:57 15 that if an expert wants to talk about something that's not

09:31:04 16 mentioned in the expert report, that that is a pretty good

09:31:08 17 basis for an objection that will be sustained. And so,

09:31:15 18 that would be reason enough to preclude that argument.

09:31:19 19     MR. CAIXEIRO: Thank you, your Honor.

09:31:22 20     THE COURT: Counsel.

09:31:31 21     MR. LODHOLZ: Thank you, your Honor. David

09:31:33 22 Lodholz for the plaintiff.

09:31:35 23     I will start with the negotiation date issue

09:31:39 24 since that's what Mr. Caixeiro covered first.

09:31:43 25     So we agree that the proper negotiation date,

09:31:46  1  whether you use the proper date or not is a legal issue.

09:31:51  2  The issue of what is the proper negotiation date, based on

09:31:55  3  the cases that we've cited, the Smith & Nephew and the

09:31:58  4  Arlington Industries case, is clearly a factual issue,

09:32:03  5  which there's clearly sufficient evidence in this case

09:32:06  6  that the date in 2015 is a sufficient negotiation date.

09:32:13  7       And what Mr. Reading talks about in his opinion

09:32:16  8  and in his deposition testimony is that, you know, he

09:32:20  9  considered it from a business licensing standpoint, what

09:32:25  10  the entities are trying to do at the negotiation time is

09:32:30  11  look for a royalty rate that they can apply going forward

09:32:34  12  to not only the currently infringing product but any

09:32:39  13  future infringing products.  And that's exactly what the

09:32:41  14  Series 300 is is a future infringing product.

09:32:46  15       And there was an issue discussed about the

09:32:48  16  entities being different, and I want to briefly address

09:32:51  17  that because, as the Court is well aware from the history

09:32:53  18  in this case, the way that worked was John Crane

09:32:57  19  Production Solutions sold all of its assets to Endurance,

09:33:01  20  and if there was a hypothetical negotiation and a

09:33:03  21  hypothetical license in 2015, then that would have been an

09:33:09  22  asset that would have been sold to Endurance, which would

09:33:10  23  have covered any infringement of the Superod patents.

09:33:15  24       So, I mean, a license, as the Court knows, is

09:33:19  25  just an agreement not to sue somebody for infringement.

| 09:33:21 | 1 | So whether it's a Series 200 or a Series 300 is |

09:33:21  1  So whether it's a Series 200 or a Series 300 is

09:33:25  2  irrelevant.

09:33:25  3       THE COURT:  I don't mean to be disrespectful, but

09:33:27  4  what you just said goes against everything I possibly

09:33:32  5  understand about how damages works.

09:33:40  6       If Apple is infringing with a phone, you go with

09:33:48  7  the hypothetical negotiation date from the infringement of

09:33:50  8  that phone.  You don't -- if they come out with a new

09:33:58  9  phone, four years from now, that also might infringe, you

09:34:05  10  don't go back to the date of the infringement of the first

09:34:10  11  phone that infringed.  They may never come out with

09:34:13  12  another phone.

09:34:17  13       I don't -- I can't imagine a situation where that

09:34:23  14  would be the way the law would work.

09:34:26  15       MR. LODHOLZ:  And, Judge, that's one of the

09:34:28  16  reasons why we found these estoppel cases.  And we do

09:34:31  17  realize that it's a different situation.

09:34:32  18       THE COURT:  There's no estoppel here.  I'm saying

09:34:36  19  you have a product that comes out on X date, and then,

09:34:38  20  another product comes out on Y date.  The hypothetical

09:34:42  21  negotiation for the second product is when that product --

09:34:47  22  when the party begins infringing with that product.

09:34:51  23  Because things change.  That's the whole point of

09:34:56  24  hypothetical negotiation.

09:34:56  25       I can't imagine your -- I can't imagine I would

| | | |
|---|---|---|
| 09:35:02 | 1 | allow in the flip side -- what you're really trying to |
| 09:35:08 | 2 | have Mr. Reading say here is that I can assume that at the |
| 09:35:14 | 3 | hypothetical negotiation in 2015, they would have |
| 09:35:20 | 4 | negotiated a reasonable royalty rate that would apply if |
| 09:35:23 | 5 | another product was released in 2018.  I know it's a |
| 09:35:28 | 6 | hypothetical negotiation, but the hypothetical part is |
| 09:35:31 | 7 | that it didn't really happen.  The parties didn't sit down |
| 09:35:34 | 8 | and do it. |
| 09:35:34 | 9 | But to the extent there's any science or |
| 09:35:41 | 10 | reliability involved in how we structure damages, it is |
| 09:35:45 | 11 | that you start from the point of where the parties were at |
| 09:35:49 | 12 | when the -- because the theory is that if you asked for |
| 09:35:56 | 13 | more money than they wanted to pay -- if you said no, I'll |
| 09:35:59 | 14 | only take a 10 percent royalty rate, they'd say, well, |
| 09:36:03 | 15 | then, we're not going to release the -- we can't make a |
| 09:36:05 | 16 | profit.  We're not going to release that. |
| 09:36:08 | 17 | That -- I mean, I know it's a hypothetical |
| 09:36:11 | 18 | negotiation, but that's the constrict of it is that, in |
| 09:36:16 | 19 | this case, you'd say it was at five percent.  And why is |
| 09:36:18 | 20 | it five percent?  Because in -- for the 200, in 2015, we |
| 09:36:26 | 21 | would have been willing to pay, they would have been |
| 09:36:31 | 22 | willing to accept this.  That everything is different in |
| 09:36:33 | 23 | 2018.  I don't -- I can't even follow your argument. |
| 09:36:40 | 24 | MR. LODHOLZ:  So I want to address two points, if |
| 09:36:42 | 25 | I can, from what you just said. |

09:36:43  1        First, that everything is different point.  So
09:36:45  2  when their own expert, Mr. Schottelkotte, did the same
09:36:49  3  analysis in his rebuttal report as between 2015 and 2018,
09:36:55  4  he said, I've looked at all of this already in 2015 and
09:36:58  5  I'm looking at it again in 2018 -- and this is on page 5
09:37:01  6  and 6 of his rebuttal report.  That's, I think, Exhibit 4
09:37:05  7  to our response.  And he says, it's all the same, I'm
09:37:08  8  using the same number.  So that's --
09:37:11  9        THE COURT:  And I think an expert can do that.  I
09:37:14 10  think an expert can say, prospectively, I am looking at
09:37:18 11  this, I'm looking at that, and I'm going to determine
09:37:22 12  having looked at everything that this is the result of it.
09:37:26 13  I don't find it possible that you could say, I used the
09:37:30 14  wrong date, which is 2015, but it's okay, it would apply
09:37:38 15  in 2018, anyway, which is what you all are saying.
09:37:41 16        MR. LODHOLZ:  And to that specific point, I want
09:37:44 17  to discuss the Enplas Display case, which is one of the
09:37:49 18  cases that John Crane relies on.  So one of the
09:37:53 19  differences in that case, there was actually two patents
09:37:57 20  at issue, and the expert for the plaintiff gave an opinion
09:38:03 21  on one of the patents that if you look at it from the
09:38:06 22  standpoint of -- and in that case, there's a pretty
09:38:11 23  significant distinction that they were looking at a
09:38:13 24  lump-sum payment, as opposed to, in this case, we have a
09:38:19 25  payout over time.  So there's a reasonable royalty rate

09:38:22  1   and then, a separate base.  And in that case, they were

09:38:24  2   applying to the rate to the base at the same time and

09:38:26  3   getting the jury to come up with one number.

09:38:30  4            But in that case, there was two separate patents,

09:38:33  5   both of which resulted in jury findings of basically a

09:38:38  6   freedom to operate license, which is the same kind of

09:38:41  7   license that Mr. Reading is advocating for in his opinion.

09:38:46  8   And only one of the freedom to operate licenses got

09:38:50  9   overturned; and that was because it was looking at --

09:38:54  10  looking into the past and speculating that products that

09:39:00  11  were being sold that were not even alleged to infringe,

09:39:04  12  that those products were included in the lump-sum two to

09:39:08  13  $4 million number and the jury ultimately came back at

09:39:12  14  four.  And so, it's --

09:39:12  15           THE COURT:  Let me ask you this.  Why did Mr.

09:39:15  16  Reading use the 2015 date?

09:39:16  17           MR. LODHOLZ:  Well, I think I could answer that

09:39:18  18  from a practical -- from just a factual perspective.  When

09:39:22  19  he wrote this original opinion and provided it, he was

09:39:26  20  going to be the expert for the Series 200 and the Series

09:39:30  21  300.  Then there was a later ruling from the Court that he

09:39:34  22  could not opine about the Series 200.

09:39:36  23           THE COURT:  Okay.

09:39:38  24           MR. LODHOLZ:  So from a practical standpoint,

09:39:40  25  that's why he did it that way.

| | | |
|---|---|---|
| 09:39:42 | 1 | THE COURT:  Why didn't he use the correct date? |
| 09:39:44 | 2 | MR. LODHOLZ:  Well, and that's in his deposition, |
| 09:39:46 | 3 | he explains that.  He looked at it from the standpoint of |
| 09:39:48 | 4 | a freedom to operate license, which in the dissenting |
| 09:39:53 | 5 | opinion in Enplas, the judge points out that there's no |
| 09:39:59 | 6 | authority that says a freedom to operate-type license is |
| 09:40:03 | 7 | somehow rejected by the Court, and explains that |
| 09:40:07 | 8 | businesses in a hypothetical negotiation situation -- if I |
| 09:40:10 | 9 | can go back to my table, I can pull it. |
| 09:40:21 | 10 | So this is the Enplas case, Judge, and the |
| 09:40:24 | 11 | dissenting opinion. |
| 09:40:26 | 12 | THE COURT:  Let me see if I understand that |
| 09:40:30 | 13 | scenario of what happened was, he uses the 2015 date.  The |
| 09:40:37 | 14 | Court makes its ruling, and then, did he consciously |
| 09:40:42 | 15 | decide he was not going to amend his report and use the |
| 09:40:46 | 16 | 2018 date and say, I don't need to because I'm going to |
| 09:40:50 | 17 | stick with the 2015 date because it's a freedom to operate |
| 09:40:55 | 18 | license? |
| 09:40:56 | 19 | MR. LODHOLZ:  Yes. |
| 09:40:56 | 20 | THE COURT:  Okay. |
| 09:40:58 | 21 | MR. LODHOLZ:  And what the dissenting opinion |
| 09:40:59 | 22 | says, Judge, is a license is intended to alleviate |
| 09:41:03 | 23 | business uncertainty.  No precedent limits the |
| 09:41:06 | 24 | hypothetical negotiation to consideration of a single |
| 09:41:09 | 25 | product.  And then, skipping forward just a couple of |

09:41:13  1    words, says the cost and disruption of separate litigation

09:41:17  2    over every existing and future product within the possible

09:41:19  3    scope of the patent is a reasonable consideration in

09:41:24  4    license negotiations, and citing to <u>Rude vs. Westcott</u> out

09:41:28  5    of the Supreme Court.  And that's on page 417 of the

09:41:35  6    opinion in the dissenting section.  So --

09:41:38  7             THE COURT:  I'm going to tell you that I think as

09:41:43  8    a matter of law that that is an incorrect way -- I think

09:41:46  9    that methodology as a matter of law is incorrect.  I could

09:41:52  10   be wrong, but I don't think that's a subject of

09:41:56  11   cross-examination or a fact issue.  I think that

09:41:59  12   methodology is incorrect.

09:42:03  13            Why don't you take up the issue of method he did

09:42:08  14   for apportionment?

09:42:09  15            MR. LODHOLZ:  Sure.  So the apportionment issue,

09:42:17  16   Judge, is clearly a cross-examination issue.  They just

09:42:20  17   disagree with the number he applied to it.  In his

09:42:24  18   deposition, he explains that he reviewed every single

09:42:27  19   aspect of what they say he didn't.  He just said that it's

09:42:31  20   not worth anything.  And what he -- I think there was an

09:42:34  21   issue in the initial argument about the technical stuff

09:42:39  22   that he looked at.  He looked at -- he says he looked at

09:42:42  23   all the technical --

09:42:43  24            THE COURT:  Tell me where -- tell me what your

09:42:47  25   technical expert did to provide him the information that

09:42:50  1  he relied on for apportionment.

09:42:52  2          MR. LODHOLZ:  I don't know specifically what our

09:42:54  3  technical expert did, but I know he relied on Mr.

09:42:58  4  Beckwith's technical explanation, at least as to the 70

09:43:02  5  percent.  And then, he said he looked at the rest of what

09:43:04  6  he talked about as to the 80 percent of the end fitting

09:43:07  7  and said that didn't make sense to him because there was

09:43:11  8  clearly no value from those additional things.  And he was

09:43:16  9  -- I mean, he was saying that based on what the other

09:43:18  10 expert said.

09:43:18  11         So it's not an issue of he didn't consider it.

09:43:22  12 It's an issue of he did consider it, and they just

09:43:24  13 disagree with his evaluation.

09:43:25  14         THE COURT:  But I thought -- what I'd like to

09:43:27  15 know is, what specific information the technical expert or

09:43:34  16 a fact witness who's in the industry, or whatever, what

09:43:38  17 they specific -- what you were going to specifically rely

09:43:41  18 upon -- let me back up.

09:43:44  19         I want to know where in Mr. Reading's report he

09:43:49  20 cites what he relied on with respect -- what he relied on

09:43:55  21 to provide his testimony with respect to apportionment.

09:44:00  22         Do you have Mr. Reading's damages report?

09:44:03  23         MR. LODHOLZ:  I have written down here that it's

09:44:08  24 in paragraph 63 through 65 of his report.

09:44:11  25         THE COURT:  If you have that, I'll take a look at

| | | |
|---|---|---|
| 09:44:13 | 1 | it.  Or we could put it up on the screen.  However you |
| 09:44:26 | 2 | want to do it, I'm happy to take a look at it. |
| 09:44:29 | 3 | MR. LODHOLZ:  He also further elaborates on that |
| 09:44:31 | 4 | in his deposition.  And that's actually the section on |
| 09:44:47 | 5 | ancillary convoyed sales, I think.  But, I mean, that's |
| 09:44:58 | 6 | another point that we make.  Oh, I'm sorry. |
| 09:45:13 | 7 | THE COURT:  Why don't you just hand it to me.  If |
| 09:45:15 | 8 | you'll hand it to Katherine.  I'm looking at page 17 of 31 |
| 09:45:27 | 9 | of Mr. Reading's expert -- and this is his only report? |
| 09:45:34 | 10 | MR. LODHOLZ:  He did a supplement? |
| 09:45:35 | 11 | THE COURT:  Let me ask you this.  Is this the |
| 09:45:36 | 12 | only -- are paragraphs 63 through 65 the only parts of his |
| 09:45:41 | 13 | report where he discusses apportionment and his basis for |
| 09:45:45 | 14 | it? |
| 09:45:46 | 15 | MR. LODHOLZ:  No.  And, actually, I was saying, |
| 09:45:47 | 16 | after looking at that and my notes again, that's actually |
| 09:45:49 | 17 | like the convoyed sales section. |
| 09:45:51 | 18 | THE COURT:  Okay.  I need whatever section -- |
| 09:45:54 | 19 | here, Katherine.  I need whatever section of the expert |
| 09:45:57 | 20 | report he has where -- I want to see where he discloses in |
| 09:46:00 | 21 | his expert report what he relied on to be able to testify |
| 09:46:05 | 22 | about with respect to apportionment. |
| 09:46:08 | 23 | MR. LODHOLZ:  So that would be in page 24 and 25 |
| 09:46:12 | 24 | of his report. |
| 09:46:13 | 25 | THE COURT:  If you'll hand that to Katherine, |

| | | |
|---|---|---|
| 09:46:15 | 1 | that will be great.  So I'm looking at pages 24 and 25 of |
| 09:46:43 | 2 | Mr. Reading's expert report, under factor 13, correct? |
| 09:46:47 | 3 | MR. LODHOLZ:  Yes. |
| 09:46:48 | 4 | THE COURT:  Okay.  I find paragraph 100 is |
| 09:46:56 | 5 | essentially just a statement of what the law is.  The |
| 09:47:07 | 6 | summary of 101 says that it is clear from the evidence in |
| 09:47:11 | 7 | this case that a critical component of the performance of |
| 09:47:14 | 8 | those sucker rods is the connection of the end fitting to |
| 09:47:17 | 9 | the fiberglass rod.  I don't find that adequate. |
| 09:47:22 | 10 | Paragraph 102 says, sucker rods are comprised of |
| 09:47:26 | 11 | three main components:  The fiberglass rod body, end |
| 09:47:30 | 12 | fittings and epoxy.  It is my understanding that the |
| 09:47:33 | 13 | claims of the patents in suit in this matter relate to the |
| 09:47:35 | 14 | design of the end fittings.  That doesn't contribute |
| 09:47:37 | 15 | anything. |
| 09:47:39 | 16 | Paragraph 103, I do recognize that there are |
| 09:47:42 | 17 | other elements of the fiberglass sucker rod that are not |
| 09:47:46 | 18 | covered by the patents in suit.  According to Mr. |
| 09:47:49 | 19 | Rutledge, manufacturing processes, raw materials and |
| 09:47:52 | 20 | processes all contribute to successful product.  And |
| 09:47:57 | 21 | there's a citation to Mr. Rutledge's deposition.  I find |
| 09:48:04 | 22 | that that is inadequate. |
| 09:48:06 | 23 | Paragraph 104, it is my understanding that John |
| 09:48:11 | 24 | Crane's technical expert, Dr. Scott Beckworth -- Beckwith |
| 09:48:15 | 25 | stated in this report, I have considered how much of the |

09:48:19 1  overall sucker rod's value to a customer is attributable
09:48:22 2  to the end fitting as explained below.  In my opinion,
09:48:26 3  approximately 70 percent of the overall value of a sucker
09:48:28 4  rod is attributable to the end fitting.  And approximately
09:48:32 5  30 percent is attributable to the fiberglass body, epoxy
09:48:36 6  and manufacturing and assembly process, and it cites to
09:48:41 7  his declaration.
09:48:44 8          And that is the sum total of what you have
09:48:47 9  submitted with respect to Mr. Reading's analysis or
09:48:55 10 reliance on his -- of what Mr. -- of Dr. -- is it Dr.
09:49:02 11 Beckwith?  Dr. Scott Beckwith said.  I don't,
09:49:16 12 unfortunately -- I don't have the "as explained below in
09:49:20 13 my opinions."  So I don't know what Dr. Beckwith said
09:49:24 14 there.
09:49:26 15         Do you happen to have Dr. Beckwith's report?
09:49:29 16         MR. LODHOLZ:  His report?
09:49:30 17         THE COURT:  Yes, sir.
09:49:31 18         MR. LODHOLZ:  I have it in a separate binder.
09:49:33 19         THE COURT:  If you could get that for me.  I'd
09:49:35 20 like to see -- it doesn't -- I'd like to see page 138 of
09:49:46 21 Dr. Beckwith's report.
09:50:02 22         MR. LODHOLZ:  Page 138, Judge?
09:50:04 23         THE COURT:  That's what it says in the footnote.
09:50:06 24 I mean, you can double check my -- I'm not the greatest at
09:50:09 25 this.  I had someone help me when I was a lawyer.

| | | |
|---|---|---|
| 09:50:12 | 1 | Yes, sir. |
| 09:50:14 | 2 | MR. CAIXEIRO:  I just want to make one point for |
| 09:50:18 | 3 | clarity.  Dr. Beckwith is our expert. |
| 09:50:20 | 4 | THE COURT:  Oh, okay.  And so, let me hear from |
| 09:50:21 | 5 | you real quick.  Is there anything in what Dr. Beckwith |
| 09:50:25 | 6 | says that provides Mr. Reading with what he's looking for? |
| 09:50:31 | 7 | MR. CAIXEIRO:  Well, I'll defer to Ms. Ainsworth |
| 09:50:34 | 8 | to -- on part of that answer, but here's the important |
| 09:50:38 | 9 | thing.  Dr. Beckwith -- they're leaving out a sentence |
| 09:50:41 | 10 | that Dr. Beckwith said, which is that within the end |
| 09:50:43 | 11 | fitting, 80 percent of the value of the end fitting is |
| 09:50:46 | 12 | attributable to the patent.  So Dr. Beckwith did a whole |
| 09:50:50 | 13 | other step of apportionment that's being be excluded by |
| 09:50:53 | 14 | Mr. Reading in this paragraph.  So. |
| 09:50:55 | 15 | THE COURT:  Okay.  And is that -- do you have |
| 09:50:59 | 16 | anything else from the plaintiff you want to submit with |
| 09:51:01 | 17 | respect to the apportionment that Mr. Reading did? |
| 09:51:05 | 18 | MR. LODHOLZ:  I do want to touch a couple of more |
| 09:51:07 | 19 | points, if I can very briefly. |
| 09:51:09 | 20 | THE COURT:  Sure.  You can have as much time as |
| 09:51:11 | 21 | you want. |
| 09:51:20 | 22 | MR. LODHOLZ:  So the cases that Mr. Caixeiro was |
| 09:51:28 | 23 | talking about, the Power Integrations, the VirnetX case, |
| 09:51:32 | 24 | again, these are all royalty-base issues.  So in every |
| 09:51:37 | 25 | expert report on damages in this case, the expert goes |

09:51:42  1  through the Georgia Pacific factors and determines the

09:51:48  2  royalty rate applicable, and then, every single expert

09:51:51  3  goes through the royalty base based on the sale of the

09:51:54  4  entire rod.

09:51:56  5          So these rulings on apportionment have to do with

09:52:01  6  the royalty base.  And there's no disagreement amongst the

09:52:05  7  experts in this case that the royalty base should be based

09:52:07  8  on -- because you can't sell an end fitting -- and that's

09:52:11  9  what Mr. Reading explains in his deposition testimony that

09:52:15  10 we've cited.  You can't sell a sucker rod by itself.  It

09:52:18  11 has to have an end fitting.  You can't sell the internal

09:52:20  12 wedge of an end fitting by itself; it has to be the entire

09:52:23  13 end fitting with the rod.

09:52:24  14         And there's a paper in this case written by the

09:52:26  15 defendants called, It's All About The End Fitting.

09:52:30  16 There's a second paper called, It's All About The End

09:52:34  17 Fitting II.  I mean, clearly in this case, the value of

09:52:38  18 this patented technology is the end fitting with the

09:52:43  19 sucker rod.  And there's even claims that we've asserted

09:52:45  20 that are for the entire rod with the end fitting.  And

09:52:49  21 every single claim that we've asserted is for the entire

09:52:53  22 end fitting.

09:52:54  23         So the suggestion that -- you know, I think Mr.

09:52:57  24 Reading did review the different -- the sales

09:53:01  25 relationships, the manufacturing processes, and he says in

| | | |
|---|---|---|
| 09:53:05 | 1 | the marketplace, based on what he's seen with the numbers, |
| 09:53:07 | 2 | that adds no value.  You know, he's looking at the |
| 09:53:11 | 3 | technical report from Mr. Beckwith.  He's looking at the |
| 09:53:14 | 4 | sales difference in the numbers and saying that adds no |
| 09:53:17 | 5 | value.  And if they want to cross-examine him on that, |
| 09:53:21 | 6 | they can. |
| 09:53:21 | 7 | THE COURT:  Do you remember what was covered in |
| 09:53:25 | 8 | the Lucent vs. Gateway case?  Do you remember what the |
| 09:53:28 | 9 | feature was? |
| 09:53:28 | 10 | MR. LODHOLZ:  I do not off the top of my head, |
| 09:53:30 | 11 | Judge. |
| 09:53:30 | 12 | THE COURT:  It was the feature in Outlook that |
| 09:53:34 | 13 | allowed you when you were picking -- going through and |
| 09:53:38 | 14 | trying to fill in the date, it auto-filled the date for |
| 09:53:41 | 15 | you.  And Lucent argued that the base -- the base was the |
| 09:53:52 | 16 | computer that you loaded Microsoft Outlook onto to |
| 09:53:57 | 17 | determine that, and in that case, the circuit made very |
| 09:53:59 | 18 | clear that no, you apportion it down, in that case, not |
| 09:54:04 | 19 | even necessarily to the Microsoft Outlook, but to the |
| 09:54:07 | 20 | value of that feature with respect to it.  They made the |
| 09:54:12 | 21 | same argument that you did, how important the date feature |
| 09:54:15 | 22 | was, how no one -- they got $500 million for that.  It |
| 09:54:21 | 23 | didn't survive appeal.  But. |
| 09:54:25 | 24 | MR. LODHOLZ:  And, Judge, we're not seeking |
| 09:54:27 | 25 | profits from related services.  That's -- the related |

09:54:32  1  service convoyed sales part and the same way as the

09:54:37  2  apportionment is part of the reasonable royalty.  But the

09:54:41  3  base rate of what's the salable unit, every expert agrees

09:54:46  4  in this case, that's the entire rod with the end fitting.

09:54:49  5       So I think what they've done is a fairly creative

09:54:52  6  way of saying, here's some case law on how do we get to

09:54:56  7  the royalty base and let's apply it to the experts'

09:55:01  8  analysis of the royalty rate and I think that's -- I think

09:55:04  9  that's an incorrect way to look at it just from a legal

09:55:08  10  perspective.  And if we're talking about what the royalty

09:55:10  11  rate is, I mean, those factors -- I mean, he looked at

09:55:12  12  every factor, and the factors are subject to

09:55:15  13  cross-examination.  Why didn't you -- you know, why didn't

09:55:17  14  you consider this?  Why didn't you consider that, instead?

09:55:20  15  That's vigorous cross-examination can correct those issues

09:55:25  16  on the royalty rate for the apportionment.

09:55:29  17       THE COURT:  Anything else?  Okay.

09:55:33  18       The Court is going to grant the motion -- the

09:55:36  19  Daubert motion both respect to the use of an incorrect

09:55:43  20  hypothetical negotiation date.  And the Court also

09:55:49  21  believes that the method of apportionment was not properly

09:55:52  22  done.

09:55:56  23       What does that do with respect to the plaintiffs'

09:55:58  24  claims for the Series 300?  I'd assume -- does that

09:56:04  25  eliminate your damage claim on that?